# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
CAPRICE BRITT,                      *
                                    *     No. 17-1352V
              Petitioner,           *
                                    *     Special Master Christian J. Moran
                                    *
v.                                  *
                                    *     Filed:  August 27, 2021
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *     fact ruling, shoulder of vaccination,
                                    *     onset of shoulder pain
              Respondent.           *
* * * * * * * * * * * * * * * * * * * *
```

<u>Leah V. Durant and Michael Milmoe</u>, Law Offices of Leah V. Durant, PLLC, for petitioner;
<u>Catherine E. Stolar</u>, United States Dep't of Justice, Washington, DC, for respondent.

## FINDINGS OF FACT[1]

Ms. Britt alleges that an influenza ("flu") vaccination given in October 2016 damaged her left shoulder, which eventually required an operation. The Secretary maintains that preponderant evidence does not support critical assertions of fact that underlie Ms. Britt's claim for compensation. In chronological order, the parties dispute the following points: (1) whether Ms. Britt was experiencing chronic shoulder pain before she received the flu vaccination, (2) whether the

---

[1] The E-Government Act, 44 § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this ruling on its website (https://www.uscfc.uscourts.gov/aggregator/sources/7). Once posted, anyone can access this ruling via the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will be reflected in the document posted on the website.

vaccine was injected into Ms. Britt's left or right shoulder, and (3) whether Ms. Britt began experiencing shoulder pain within 48 hours of her vaccination.

Ms. Britt submitted documentary evidence over the course of the litigation. The documentary evidence includes Ms. Britt's medical records, her employment records, affidavits, and information provided by Quest Diagnostics, Inc.  After Ms. Britt appeared to have gathered all available documents, a two-day hearing was held on February 10-11, 2021.  At the hearing, oral testimony was taken from three professionals who treated Ms. Britt: a chiropractor, Johnny Garcia; a physical therapist, Vanessa Erens; and an orthopedist, Phani Dantuluri.  Ms. Britt and her husband also testified.  This testimony as well as the documentary evidence are the foundation for the findings of fact.

## Standards for Adjudication

Petitioners are required to establish the elements of their case by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In reaching decisions, special masters are expected to examine the "record as a whole."  42 U.S.C. § 300aa–13(a)(1).  Special masters are directed to consider the medical records, but medical records are not "binding on the special master."  42 U.S.C. § 300aa–13(b)(2); accord Snyder v. Sec'y of Health & Human Servs., 88 Fed. Cl. 706, 745 n.67 (2009).  Congress authorized special masters to find the "onset of . . . an injury . . . occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom . . . was not recorded or was incorrectly recorded as having occurred outside such period."  42 U.S.C. § 300aa–13(b)(2).

## Creation of Medical Records and
## Evidentiary Standards for Evaluating Medical Records

While medical records typically serve as the basis for findings about events that happen in a vaccinee's medical history, relatively few decisions have discussed how medical records are created.  For a secondary source's discussion, see Catherine Palo, *Discovery and Evaluation of Medical Records*, 78 AM. JURIS. Trials 559 (2021).  The present case, however, contains evidence about the process by which doctors and other medical professionals produce and maintain documents

2

about their patients.  This foundation helps to explain legal assessments about the evidentiary value of information contained within medical records.

The process for creating a medical record begins with the patient.[2]  The patient communicates the problems affecting him or her.  Tr. 9, 31, 35; see also James-Cornelius v. Sec'y of Health & Human Servs., 984 F.3d 1374, 1380 (Fed. Cir. 2021) (indicating that petitioners are competent to testify when problems began); Samuel D. Hodge, Jr. and Joanne Callahan, *Understanding Medical Records in the Twenty-First Century*, 22 BARRY L. REV. 273 (2017).  The method of communication can vary.  Depending upon the procedures at a particular medical facility, the patient might handwrite a form or might enter information electronically.  An electronic medical record system might allow a patient to select their symptom from a pre-defined set of choices.  Tr. 9, 53, 133-34; see also Tr. 152 (noting that the "history of present illness" comes from the patient).

Patients are generally expected to present all their complaints to a medical doctor.  When a medical record fails to include a complaint, special masters may infer that the omission of a problem supports a finding that the patient was not experiencing that problem.  Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1574 (Fed. Cir. 1993) (rejecting an argument that the special master was arbitrary in relying upon "the absence of medical records"); Mowen v. Sec'y of Health & Human Servs., 70 F.3d 1290 (table) No. 95-5040, 1995 WL 684565, at *2 (Fed. Cir. 1995) (unpublished and non-precedential opinion) (accepting the special master's explanation that it was "unbelievable that if [a child] was suffering from five to ten staring spells a day lasting up to ten minutes each during that nearly two month period, as [the mother] asserted, that she would not have told the doctor"); Small v. Sec'y of Health & Human Servs., No. 15-478V, 2020 WL 918799, at *8 (Fed. Cl. Jan. 27, 2020) ("It was reasonable for the special master to give his medical-records-based inference more weight than the affidavits and [petitioner's] expert report."); D'Tiole v. Sec'y of Health & Human Servs., 132 Fed. Cl. 421, 433 (2017) (ruling that special master did not abuse his discretion in finding that medical records did not consistently describe sleep problems for which petitioner was seeking compensation), aff'd on non-relevant ground in non-precedential opinion, 726 Fed. App'x 809 (Fed. Cir. 2018); Holt v. Sec'y of Health & Human Servs., 132 Fed. Cl. 194, 198 (2017) (ruling that special master had a rational basis for finding child did not suffer a fever after vaccination and rejecting argument that a doctor created inaccurate records); Rich v. Sec'y of Health &

---

[2] When the person receiving medical care is a child, a parent will usually communicate with the medical personnel.

Human Servs., 129 Fed. Cl. 642, 653-54 (2016) (noting that petitioner saw doctors in the relevant time and stating "it was entirely appropriate for the special master to rely upon the absence of neurological symptoms in the medical records compiled during the fall of 2010 as a basis for determining when those symptoms first occurred'); Doe 17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008) ("This court has held that a lack of contemporaneous evidence to corroborate a petitioner's allegations of symptoms can justify a finding that those allegations are not credible"); Beddingfield v. Sec'y of Health & Human Servs., 50 Fed. Cl. 520, 523 (2001) (denying motion for review of a decision in which the special master reasoned "it impossible to believe that [a child's] family would have allowed him to suffer at home for so long over the weekend . . . or that [a doctor] after learning of these symptoms on Monday, would have instructed [the child] to stay home and see her the following day"); O'Connell v. Sec'y of Health & Human Servs., 40 Fed. Cl. 891, 893 (1998) (denying a motion for review of decision in which special master "declined to find, for lack of substantiation in the contemporaneous medical records, that, on the day following her receipt of the vaccine, [the child] experienced a seizure-related diminution of consciousness that lasted up to one-half hour."), aff'd in non-relevant part in unpub. op., No. 98-5134, 217 F.3d 857, 1999 WL 1039699 (Fed. Cir. 1999); Gurr v. Sec'y of Health & Human Servs., 37 Fed. Cl. 314, 318 (1997) ("Given the well-documented diligence with which petitioners pursued pediatric care for [their son] during the course of his development, it seems highly unlikely, as noted by respondent, that petitioners would have difficulty producing a record of [the boy's] medical ailments as described in their testimony prior to his death if they were indeed so severe in nature"); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (denying motion for review of a decision in which the special master reasoned "if [a child] had suffered such losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical professionals who evaluated [the boy] during his life to date"), aff'd, 117 F.3d 545 (Fed. Cir. 1997); see also Tr. 31 (chiropractor testifying that if a chiropractic record from his facility does not mention left shoulder pain, then the patient did not report left shoulder pain at that visit).

However, medical records do not always memorialize all the symptoms a patient is experiencing at the time.  Petitioners have persuasively explained why they did not complain to a particular medical doctor.  See Kirby v. Sec'y of Health & Human Servs., 997 F.3d 1378, 1382-83 (Fed. Cir. 2021); Tenneson v. Sec'y of Health & Human Servs., 142 Fed. Cl. 329, 339 (2019) (special master was not arbitrary in crediting petitioner's testimony "regarding the onset date of her

shoulder injury, notwithstanding her delay in seeking treatment"); La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 203 n.33 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).  For example, a woman with a shoulder problem may not tell her gynecologist about discomfort in her arm.

Regardless of how the patient initially expresses her or his complaint, medical personnel often ask additional questions.  See Tr. 134, 143 (testimony of an orthopedist that his nurse and/or medical assistant takes a history).  For example, a doctor might ask when the problem started because treatments for an acute injury might differ from treatments for a chronic condition.  Tr. 188.

The patient might not communicate entirely or accurately.  For example, a patient might omit information that medical personnel could find useful.  See, e.g., Tr. 26 (testimony of a chiropractor that he was not aware petitioner had shoulder operation), 29 (testimony of a chiropractor that he was not aware petitioner visited an emergency room approximately 14 days before the visit), 160 (testimony of an orthopedic surgeon that he was not aware petitioner had a prior operation on her shoulder).  A patient also might erroneously describe a chronology of events, particularly when those events occurred years before the medical appointment. Cases have recognized those limitations to medical records.  Dobrydnev v. Sec'y of Health & Human Servs., 566 F. App'x 976, 983 (Fed. Cir. 2014) (stating the special master was not arbitrary in not crediting the opinion of a treating doctor who was "without a full understanding of the child's medical history"); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Rodrigue v. Sec'y of Health & Human Servs., No. 17-1364V, 2020 WL 738200 (Fed. Cl. Spec. Mstr. Jan. 10, 2020).

The patient's complaints guide the examination the medical personnel conduct.  Tr. 31.  The medical personnel will typically record the results of any test as an objective measurement.  See, e.g., Tr. 79, 99.

After learning about the patient's history and conducting an examination, the medical personnel will form an assessment of the patient.  The assessment reflects the doctor's or therapist's thoughts about what is wrong with the patient.  Because of a doctor's first-hand observations about a patient, a treating doctor's opinion regarding diagnosis is often persuasive.  However, even on diagnosis, the findings of a treating doctor are not necessarily dispositive.  R.V. v. Sec'y of Health & Human Servs., 127 Fed. Cl. 136, 141 (2016), appeal dismissed, No. 16-2400 (Fed. Cir. Oct. 26. 2016).

In conjunction with the doctor's assessment, the doctor will ordinarily recommend a course of action. This recommended plan might include a referral for a follow up appointment or testing at an outside facility.

Medical personnel usually create medical records during the appointment with the patient or before the end of the day. Tr. 112. A prompt memorialization of the communications and observations during the medical appointment contributes to the accuracy of information presented in the medical record.

Medical records are created for a variety of reasons. For example, a medical record is a documentation that the person is receiving treatment that should comport with the standard of care. Tr. 111; see also Tr. 34. Medical records provide reference points for treaters to understand a patient's health over time and guide clinical treatment. Tr. 111.

The medical record is sometimes divided into constituent parts --- Subjective, Objective, Assessment, and Plan. See Doe/34 v. Sec'y of Health & Human Servs., No. [redacted], 2009 WL 1955140, at *2 n.4 (Fed. Cl. Spec. Mstr. Feb. 2, 2009) (defining "SOAP" note), mot. for rev. denied, 87 Fed. Cl. 758 (2009); Hodge & Callahan, 22 BARRY L. REV., at 279.

After a medical record is created in electronic form, the information sometimes carries forward from visit-to-visit automatically. Tr. 23-24, 30, 43, 56, 92. The prepopulating or automatic filling of fields in an electronic medical record can, in the undersigned's experience, make determining what part of the record contains current information challenging. E.g., Rodrigue, No. 17-1364V, 2020 WL 738200; Giannetta v. Sec'y of Health & Human Servs., No. 13-215V, 2017 WL 4249946, at *11 n.6 (Fed. Cl. Spec. Mstr. Sep. 1, 2017) (quoting doctor retained by the petitioner as testifying due to the use of electronic medical records "it just takes one mistake and then the mistake gets propagated"); see also Jeffrey L. Masor, Electronic Medical Records and E-Discovery: With New Technology Come New Challenges, 5 HASTINGS SCI. & TECH. L.J. 245, 260 (2013) (the "copy and paste function of electronic medical records is also problematic in the context of discovery").

Once the medical record is created, the person who is the subject of the medical record can obtain that record. Congress anticipated that petitioners in the Vaccine Program would gather their medical records as Congress directed that a "petition . . . shall contain" a variety of medical records listed in 42 U.S.C. § 300aa–11(c)(2).

Although Congress did not require the admission of evidence in the Vaccine Program to comply with the formal requirements of the Federal Rules of Evidence (see 42 U.S.C. § 300aa–12(d)(2)(B)), that relative liberality may not have changed much about the treatment of medical records. Outside of the Vaccine Program, the Federal Rules of Evidence recognize that a statement made for "medical diagnosis or treatment" is not excluded by the rule against hearsay evidence. FED. R. EVID. 803(4).

Thus, in the Vaccine Program, medical records are admitted into evidence quite easily. And, the parties often will accept that the medical records accurately describe the person's condition around the time that the medical records were created. See Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But, from time-to-time, the parties dispute the accuracy or the completeness of medical records. In those situations, special masters are expected to consider the record as a whole (section 13(a)) in determining how the evidence preponderates.

In setting forth the findings below, the undersigned also cites to the primary evidence that is the basis for the finding. The undersigned recognizes that not all evidence is entirely consistent with these findings. See Doe 11 v. Sec'y of Health & Human Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not arbitrary despite some contrary evidence). Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve factual disputes.

## Analysis

Here, based upon inconsistencies within the medical records and affidavits, the parties could not agree upon what happened to Ms. Britt. Before the hearing, the parties identified three issues requiring resolution. These are: (1) whether Ms. Britt was having problems in her left shoulder before she received the flu vaccine on October 4, 2016, (2) whether Ms. Britt received the flu vaccine in her right shoulder or left shoulder, and (3) when Ms. Britt experienced significant left shoulder pain. These are resolved below.

In addition to those three issues, this ruling further summarizes evidence on three additional topics. These are (4) the treatment for Ms. Britt's shoulder problem, (5) the operation to repair an injury within her shoulder joint, and (6) an opinion from one of Ms. Britt's orthopedic surgeons about the cause of her shoulder problem.

### 1. Extent of Any Pre-Existing Shoulder Problem

In July 2013, Ms. Britt reported left shoulder pain to her orthopedist, Dr. Maurice Jove. Exhibit 10 at 2; Tr. 229-32.[3] After a course of conservative treatment including physical therapy at Select Physical Therapy, Dr. Jove operated on Ms. Britt's shoulder on December 30, 2013. Exhibit 6 at 12; exhibit 10 at 22; exhibit 14 ¶ 2; exhibit 36 at 2 (records from Select Physical Therapy); Tr. 232-36. The specific type of shoulder operation is known as a subacromial decompression. According to physical therapist Erens, a subacromial decompression is a standard operation with which she was familiar. Tr. 90.

Dr. Jove also performed a bursectomy. Exhibit 6 at 12. According to Dr. Dantuluri, who did not perform this operation on Ms. Britt, some orthopedic surgeons remove the bursa to visualize the rotator cuff more clearly. Tr. 161. So, the removal of the bursa does not necessarily mean that that the bursa was inflamed. Id. However, Dr. Dantuluri acknowledged that Dr. Jove's notation of "chronic impingement" meant that Ms. Britt was having inflammation in her bursa and possibly in her rotator cuff. Tr. 163.

After the operation, Dr. Jove diagnosed Ms. Britt as suffering from subacromial impingement. Exhibit 6 at 12. Following Dr. Jove's operation, Ms. Britt had physical therapy again. Initially, Ms. Britt had physical therapy at a location near her home. Exhibit 13 (Atlanta Rehab & Performance Center); Tr. 238-39. But, once Ms. Britt returned to work, she resumed physical therapy at Select Physical Therapy on January 27, 2014. Exhibit 36 at 28-50; Tr. 113, 239. Upon Ms. Britt's returning to Select Physical Therapy, the physical therapist evaluated the functioning of Ms. Britt's shoulder and determined Ms. Britt had a decrease in strength as well as a decreased range of motion in her left shoulder. Exhibit 36 at 29; Tr. 56, 114; see also Tr. 245-46.[4] In the January 27, 2014

---

[3] Ms. Britt sometimes described Dr. Jove as her "lower half" or "bottom half" orthopedist. Tr. 226, 337. This characterization distinguishes Dr. Jove from a different orthopedist, Dr. Dantuluri, whom Ms. Britt saw for a shoulder problem starting in 2016. Ms. Britt's depiction of Dr. Jove as a lower body orthopedist is not consistent with how Dr. Jove viewed himself and is not accurate in that Ms. Britt underwent a shoulder operation performed by Dr. Jove in 2013. Tr. 244.

[4] Because Ms. Britt had previously completed some therapy at Select Physical Therapy, the January 27, 2014 evaluation was a "reevaluation," but because the January 27, 2014 evaluation was also after a gap in treatment at Select Physical Therapy, it was also an "initial evaluation." Tr. 80.

appointment, Ms. Britt and her therapist came up with a list of goals.  Tr. 114.  For example, one goal was to decrease Ms. Britt's pain rating from 8 out of 10 to 1 out of 10.  Exhibit 36 at 30; Tr. 114-16.

Ms. Britt attended a series of physical therapy sessions, although her attendance was not as often as expected.  Exhibit 36 at 2-50; Tr. 116; see also Tr. 242.  The skilled physical therapy reflected that Ms. Britt was not independent.  Tr. 59.

After approximately 14 in-person appointments, Ms. Erens decided to discharge Ms. Britt from physical therapy.  Tr. 57-58.  A physical therapist's decision to discharge can be based upon a variety of factors, including the patient's satisfaction with the level of functioning and the patient's knowledge of home exercises.  Tr. 58.[5]  A physical therapist may discharge a patient without the patient necessarily returning to 100% of their previous level.  Tr. 59, 81, 101.

At the March 10, 2014 discharge, the physical therapist, Ms. Erens, documented that Ms. Britt had improved.  Ms. Britt estimated that she had returned to 85 percent of her previous functioning.  Exhibit 36 at 50; Tr 98, 102.  By objective measurements, Ms. Britt had improved.  Tr. 60.  Ms. Britt's pain goal was achieved as Ms. Britt now rated herself as a 1 out of 10.  Exhibit 36 at 57; Tr. 97, 246-47.[6]

While Ms. Britt had improved, she was not 100% by the March 10, 2014 discharge.  Tr. 58, 102.  She had difficulty lowering heavy objects from a height.  She could not vacuum, sweep, or mop.  Tr. 95-96, 246, 394.

Ms. Erens testified that at discharge, she was optimistic that Ms. Britt could continue her improvement especially if Ms. Britt performed the home exercise program.  Tr. 59; 103, 118-19 (estimating a 90% likelihood of returning to her previous level of function).  A home exercise program is intended to allow the patient to make gains in strength and coordination.  Tr. 59.  Whether a person

---

[5] A patient might "self-discharge" himself or herself from physical therapy because of a financial impediment or because of inconvenience.  Tr. 63.

[6] In another place in a March 10, 2014 record, Ms. Britt's pain score is recorded as 8 out of 10.  Exhibit 36 at 50.  However, Ms. Erens suspected that this rating was carried forward from Ms. Britt's January 27, 2014 rating.  Tr. 96-97.  The conflicting information within the March 10, 2014 document is an example of the difficulty in uncritically crediting medical records that appear to be created contemporaneously.  Similarly, information about Ms. Britt's ability to perform activities of daily living seems to have carried forward from note to note.  Tr. 91.

performs a home exercise program affects whether she (or he) continues to progress. The failure to follow the home exercise program can lead to regression. Tr. 81. Ms. Britt and Mr. Britt described Ms. Britt's efforts with the home exercise program in the foyer of their home using exercise bands. Tr. 365-66, 420.

Following this program, Ms. Britt's primary care doctor, Kris Manlove-Simmons, recorded that Ms. Britt's left shoulder was normal. Exhibit 3 at 110 (May 22, 2014); accord Tr. 365. Ms. Britt also underwent a course of physical therapy for low back pain from April 7, 2014 to June 30, 2014. Exhibit 36 at 60-105; Tr. 61-65, 120. These records do not memorialize any complaints about shoulder pain. Presumably, if Ms. Britt were having shoulder pain, she would have informed the therapists who were treating her. Tr. 66, 100, 120-21.

In arguing that Ms. Britt continued to have left shoulder pain, the Secretary relies upon statements in three medical records. First, the Secretary points to a January 27, 2016 record from Dr. Manlove-Simmons, which states "chronic left shoulder pain." Resp't Statement regarding Onset, filed Mar. 6, 2020, at 5-6, citing exhibit 3 at 46. This notation appears within the portion of the record in which Dr. Manlove-Simmons appears to be reporting on her review of Ms. Britt's systems. Exhibit 3 at 46. However, when questioned about this notation during the hearing, Ms. Britt seemed confused about this statement. As Ms. Britt testified, the January 27, 2016 medical record memorializes a complaint about back pain in the history of present illness. But, the review of systems does not reflect any problem with Ms. Britt's back. Tr. 321. Further, under physical examination, Dr. Manlove-Simmons reviews Ms. Britt's musculoskeletal system and made notes about Ms. Britt's "spine, ribs and pelvis." But, there is not any discussion of a shoulder pain problem. See exhibit 3 at 47-48.

While this January 27, 2016 report provides a legitimate basis for the Secretary's position, the report of "chronicity" appears inconsistent with the approximately 15 other appointments from March 2014 to January 2016 in which Dr. Manlove-Simmons did not memorialize any complaints about shoulder pain. See exhibit 3. Accordingly, the January 27, 2016 report about "chronic left shoulder pain" carries less weight than the other medical records that fail to evidence any on-going problems in Ms. Britt's left shoulder.[7]

The Secretary also points to a September 5, 2016 visit to the emergency room. Resp't Statement regarding Onset at 6, citing exhibit 6 at 51-52. Ms. Britt

---

[7] Given the inconsistencies in the January 27, 2016 record, the Secretary may have been well served to elicit testimony from Dr. Manlove-Simmons during the hearing.

sought emergent care after she stood up from a couch and experienced "left-sided upper back pain." Exhibit 6 at 52; see also Tr. 250-53, 338. The medical record shows that the physician in the emergency room, Brent Allen, examined Ms. Britt's spine and found no tenderness. But, upon palpation, Dr. Allen could reproduce pain in Ms. Britt's thoracic region. Exhibit 6 at 53. Dr. Allen assessed her as having "musculoskeletal pain" and ruled out other conditions such as spinal stenosis. Id.

While Dr. Allen's report and examination focuses on Ms. Britt's back / spine, the hospital's admission record states that the admitting diagnosis is "left arm pain." Exhibit 6 at 51. Ms. Britt stated that she thought this notation was in error because she did not go to the emergency room for "left arm pain. I went there for my back." Tr. 252.

In the context in which the examining doctor's report details an evaluation of Ms. Britt's back pain, a stray reference to "left arm pain" in an admitting form carries relatively little weight. The September 5, 2016 emergency room record does not meaningfully advance the Secretary's argument that Ms. Britt was experiencing chronic left shoulder pain before her vaccination.

Similarly, the June 15, 2016 report from Dr. Manlove-Simmons seems aberrational. There, Dr. Manlove-Simmons memorialized a strain of muscles, fascia, tendons at shoulder and upper arm. Dr. Manlove-Simmons "order[ed] PT for left sided trapezius and left lower back." Exhibit 3 at 178; accord Tr. 322-26. Rather than attend another round of physical therapy, Ms. Britt sought assistance from a chiropractor. Tr. 255-56, 369.

The chiropractors, Johnny Garcia and his associate Van Tran, treated Ms. Britt's lower back over 12 sessions. See exhibit 17; Tr. 11. These chiropractors did not note any complaint about shoulder pain. Then, on August 15, 2016, chiropractor Tran documented that Ms. Britt complained about pain in her right (not left) shoulder and she attributed this pain to sleeping on it wrong. Exhibit 17 at 27; Tr. 12. After Ms. Britt made a new complaint, the chiropractor's diagnosis did not change.[8] On this occasion as well as the next two appointments, the chiropractors did not record that they treated Ms. Britt's shoulder. See exhibit 17 at 27-31; Tr. 12-13, 27; see also Tr. 259-60 (Ms. Britt's testimony denying that she

---

[8] Although Ms. Britt raised a new complaint, her diagnosis remained the same. Tr. 12, 15, 30. The lack of updating again demonstrates that electronically created medical records are not always accurate.

received treatment on her shoulder from a chiropractor and explaining that if she were having pain in her shoulder, the chiropractic treatment would have been too painful).  In his oral testimony, the supervising chiropractor struggled to try to explain how Ms. Britt could report a shoulder problem even though the medical record does not document any treatment on that shoulder.  Tr. 39.[9]  And, notably, Ms. Britt was describing a problem in her right shoulder, not her left.  Tr. 262-63.

In the final treatment with her chiropractor, Ms. Britt's primary complaint was for lower back pain.  Dr. Garcia recommended that Ms. Britt schedule appointments every two weeks to maintain her condition in her lower back.  He was not expecting Ms. Britt to need treatment on her shoulder.  Exhibit 17 at 29; Tr. 15-16.  Ms. Britt did not seek any further chiropractic treatment from Dr. Garcia after September 2016.  Tr. 29.

Recognizing that the medical records do not memorialize active problems with the muscles typically associated with the shoulder and that Ms. Britt testified she was not having problems with her left shoulder (Exhibit 14 (petitioner's affidavit, dated Feb. 8, 2018) ¶ 4; Tr. 250, 318), the undersigned finds that Ms. Britt was not having significant shoulder pain in the months before October 4, 2016.

However, Ms. Britt did also report pain in the trapezius muscle and had physical therapy involving her neck, starting September 27, 2016.  This physical therapy was for vertigo.  Exhibit 6 at 79.  The exercises primarily involved how Ms. Britt positioned her head.  Tr. 107-09, 275-76, 370-72.  Whether any problem with the trapezius muscle would also impair the functioning of other muscles in Ms. Britt's shoulder, such as the deltoid muscle, is not clear in the existing record.  Expert testimony on this topic might be appropriate.

## 2.  Left Shoulder or Right Shoulder

Ms. Britt's employer, Coca-Cola, arranged for Quest Diagnostics, Inc., to provide flu vaccinations to its employees.  Tr. 263.  Ms. Britt received a flu vaccination on October 4, 2016.  The person who administered the vaccine was Laura Radford.  Exhibit 20.  Ms. Radford filled out a vaccination form, filling in a circle to indicate that Ms. Britt received the vaccination in her right arm.  Exhibit 1; exhibit 20 at 2; exhibit 28 at 5.

---

[9] The chiropractor who testified, Johnny Garcia, owns the facility where Ms. Britt was treated.  However, Dr. Garcia treated Ms. Britt on only two occasions.  Tr. 11.

Within approximately one week, Ms. Britt informed a physical therapist that she was having pain in her left arm "from flu shot." Exhibit 6 at 62; see also Tr. 276 (Ms. Britt's testimony about discussion with physical therapist). Other medical records, although created later in time, repeat Ms. Britt's account that her left arm pain followed a vaccination in her left arm. E.g. exhibit 29 (message through patient portal on December 30, 2016).

During the hearing, Ms. Britt similarly testified about her belief that the vaccination was administered into her left shoulder. Tr. 265, 269, 274, 378. Ms. Radford was not called as a witness because Quest Diagnostics represented that Ms. Radford did not remember anything about the vaccination years earlier. Exhibit 28 (answers to interrogatories).

Ms. Britt's testimony that she received the vaccination into her left shoulder is credible and corroborated by a physical therapy record created six days later. Although questioned about her awareness of the Vaccine Injury Compensation Program (Tr. 309-10), no persuasive evidence suggests that Ms. Britt provided information to her physical therapist erroneously. Cf. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); Thelen v. Sec'y of Health and Human Servs., No. 90-22V, 1991 WL 38084, at *11 (Fed. Cl. Spec. Mstr. Mar. 6, 1991) (stating that the pressures of litigation may affect memory). Moreover, Quest Diagnostics appears not to have any policy that allows a recipient of a vaccination to correct a vaccination record, frustrating Ms. Britt's efforts to amend her vaccination record. See exhibit 28 (answers to interrogatories from Quest Diagnostics); exhibit 8 (Ms. Britt's affidavit) ¶ 4 (describing unsuccessful attempts to communicate with Quest Diagnostics); Tr. 313 (Ms. Britt's testimony on cross-examination about when she noticed an error in the vaccination form); Tr. 377.

Accordingly, the undersigned finds that a preponderance of the evidence establishes that Ms. Britt received the flu vaccination into her left shoulder.

### 3. Onset of Left Shoulder Pain

As previously mentioned, an October 10, 2016 physical therapist record states that Ms. Britt had left arm pain "from [a] flu shot." Exhibit 6 at 62; see also

13

Tr. 280-82.  Ms. Britt testified that her left shoulder pain began with the vaccination and worsened over the next few days.  Tr. 270-72.

To dispute this position, the Secretary points to an October 28, 2016 record Ms. Britt's orthopedist, Dr. Dantuluri, created.  Resp't's Statement regarding Onset at 7, citing exhibit 2 at 9.  Dr. Dantuluri recorded that Ms. Britt woke up one day with pain and was having shoulder problems for a "month."  Exhibit 2 at 9; Tr. 133.[10]  If a month means exactly 30 days, then the onset of Ms. Britt's shoulder problem was a few days *before* her October 4, 2016 vaccination.[11]

In requesting information about the duration of a problem, Dr. Dantuluri is primarily interested in learning if the problem is from an acute trauma, like a car accident, or is part of a chronic condition that has lasted for years.  Tr. 135.  In this context, Dr. Dantuluri explained that a "month" does not always mean exactly 30 days.  Tr. 146.  Special masters have acknowledged this reasoning.  See Lawler v. Sec'y of Health & Human Servs., No. 19-0017V, 2020 WL 4299126, at *4 (Fed. Cl. Spec. Mstr. June 24, 2020); Cooper v. Sec'y of Health & Human Servs., No. 16-1387V, 2018 WL 1835179, at *5 n.13 (Fed. Cl. Spec. Mstr. Jan. 18, 2018); Furniss v. Sec'y of Health & Human Servs., No. 14-481V, 2015 WL 4722648, at *2 (Fed. Cl. Spec. Mstr. July 15, 2015) (finding that a medical record stating that numbness started when he woke up "about three weeks ago" did not mean exactly 21 days); Howard v. Sec'y of Health & Human Servs., No. 03-550V, 2006 WL 932381, at *6 (Fed. Cl. Spec. Mstr. March 22, 2006) ("if a person estimates that something began 'about three months ago,' that estimate usually does not mean *precisely* three months ago. It is an *estimate*.").

Accordingly, preponderant evidence supports the finding that Ms. Britt's left shoulder pain began on October 4, 2016, after the flu vaccination.

---

[10] Ms. Britt did not recall telling Dr. Dantuluri that she woke up with shoulder pain.  Tr. 328.

[11] The implicit conflict between the October 10, 2016 physical therapy record and Dr. Dantuluri's October 28, 2016 record further illustrates why special masters cannot be bound by all statements in all medical records.  42 U.S.C. § 300aa–13(b)(1).  In the earlier record, Ms. Britt's shoulder pain was "from a flu shot," meaning the flu shot preceded the shoulder pain. However, if Dr. Dantuluri's record is read literally, the flu shot came after the shoulder pain. Thus, due to the tension in two records created within one month of the vaccination, one record must necessarily carry more weight and another record carry less weight.

### 4. **Treatment of Shoulder Injury**

For the October 28, 2016 visit, Ms. Britt wrote on her intake form that she was having shoulder pain for about a month. Exhibit 45. She also told Dr. Dantuluri's nurse that she was having pain for about one month. Exhibit 46. Neither the intake form nor the nurse's note mentions the October 4, 2016 flu vaccination. See exhibits 45-46.[12] Ms. Britt, however, testified that she wrote on the intake form that the vaccine preceded the start of the shoulder pain and testified that she told the nurse about the vaccination. Exhibit 30 (petitioner's affidavit, dated Jan. 5, 2020, ¶ 5); Tr. 284, 382.[13] Dr. Dantuluri does not normally ask his patients who present with a shoulder injury whether they recently received a vaccination. Tr. 153, 187.

Ms. Britt reported that her shoulder pain rated 4-6 out of 10. Exhibit 2 at 9; Tr. 133. She reported the pain started after she slept wrong. Tr. 153. Dr. Dantuluri examined her shoulder and tested for impingement. He recognized signs of bursitis and impingement. Tr. 134. Dr. Dantuluri sent her for an X-ray which revealed that Ms. Britt had a type III acromion. Exhibit 2 at 9-10. Dr. Dantuluri offered a relatively standard range of options, recommending treatment with a steroid. Exhibit 2 at 9; Tr. 136.

At the next visit, Ms. Britt reported that she was about the same. Exhibit 2 at 7 (Dec. 12, 2016). Dr. Dantuluri's findings on physical examination were the

---

[12] Although Ms. Britt appeared to have produced all records from Dr. Dantuluri's office in advance of the hearing, the intake form and the nurse's note were not included. See exhibit 2. The absence of these records might be explained by the transition to a new electronic medical record system in Dr. Dantuluri's practice in 2017. Tr. 128. During his oral testimony, Dr. Dantuluri revealed that on October 28, 2016, Ms. Britt probably completed an intake form and his nurse also prepared a note. Tr. 177.

Ms. Britt then obtained and submitted those two records as exhibits after the hearing on February 12, 2021. The omission of these records as well as Dr. Dantuluri's testimony about them suggests that a good-faith production of medical records does not always capture all the available documents. Thus, the oral testimony of Dr. Dantuluri added relevant information.

[13] Ms. Britt's testimony that she associated her shoulder pain with the flu vaccination on the intake form is wrong. See exhibit 45. Ms. Britt's testimony that she told the nurse that her shoulder pain started in association with her vaccination also appears inaccurate. This inaccuracy, in turn, seems to derive from the inevitable problems with memory. Although the ability of people to testify accurately about events stored in their memory is an issue whenever the parties have disputes about the persuasiveness of medical records, the Secretary has not, to the undersigned's awareness, presented testimony from an expert on memory in any case.

same.  Id.; see also Tr. 140.  In response, Dr. Dantuluri recommended an MRI.  Tr. 140.

Ms. Britt underwent an MRI on December 20, 2016, a process that takes approximately 45 minutes from the patient's perspective.  Exhibit 2 at 11-12; Tr. 194.  The radiologist interpreting the MRI reported, among other things, the following findings:  "There is severe tendinosis in the infraspinatus tendon and moderate tendinosis in the supraspinatus tendon. . . There is likely intrasubstance tearing involving the lateral aspect of the infraspinatus tendon. There is a small amount of fluid see[n] in the subacromial/subdeltoid bursa."  Exhibit 2 at 11.  The radiologist also suggested that Ms. Britt may have a "minimal tiny full-thickness pinpoint perforation."  Id.  One of the radiologist's impressions was "Mild subacromial/subdeltoid bursitis."  Id. at 12.

Dr. Dantuluri defined some terms in the radiologist's report.  The term "tendinosis" means inflammation of a tendon.  Tr. 195.  The terms "severe" or "moderate" or "mild" are adjectives that radiologists use to describe their subjective impression about the degree of inflammation.  Tr. 196.  A radiologist's characterization of inflammation as severe (as for Ms. Britt) does not connote the duration of the inflammation.  Tr. 195.  On the other hand, the term "bursitis" is not usually described in degrees.  Tr. 193.

After the MRI, Dr. Dantuluri recommended a second steroid injection to calm the inflammation in Ms. Britt's shoulder.  Tr. 141.  He expected that the steroid injection might cause pain lasting as much as one week.  Tr. 142.

During this time, Ms. Britt sent Dr. Dantuluri a message through the practice's patient portal.  Exhibit 29 (Dec. 30, 2016); Tr. 285, 383.  Ms. Britt discussed her current condition as well as her history.  For her present status, Ms. Britt stated: "I'm still experiencing pain/sharp pain . . . and can't sleep on the left shoulder.  Second injection isn't working yet."  Id.  Dr. Dantuluri's team responded: "It is very typical that the [steroid] injection can take 4-6 weeks to see an effect so remain patient and hopefully it will improve over the next few weeks."  Id.

The second aspect of Ms. Britt's patient portal message concerns her history.  She stated: "This [shoulder] pain started in October after receiving the flu shot at work on October 4.  I did mention this to Dr. Dantuluri at my December 12 visit and to the nurse at my October 28 visit."  Id.  Dr. Dantuluri's response did not address this chronology.  The accuracy of the patient portal message is questionable.  While Ms. Britt stated that she told Dr. Dantuluri and his nurse about the flu vaccination, no documents from Dr. Dantuluri's practice corroborate

16

this account.  In his testimony, Dr. Dantuluri could not shed any light about the message.  See Tr. 141, 171, 204-05.

When Ms. Britt did not improve with the second steroid injection, Dr. Dantuluri's assistant (Ms. Rachel Davis) referred her to physical therapy.  Exhibit 2 at 4; see also Tr. 198.  This course of physical therapy began on February 20, 2017.  Exhibit 2 at 42; see also Tr. 386.  In the initial form, the date of injury is listed as "October 2016," which would accord with a finding that the shoulder pain started after Ms. Britt's October 4, 2016 flu vaccination.

The physical therapy for Ms. Britt's shoulder in 2017 was relatively uneventful.[14]  Tr. 288-91.  She saw Dr. Dantuluri once for left shoulder impingement, rotator cuff inflammation, and bursitis.  He continued her physical therapy.  Exhibit 2 at 4 (April 13, 2017).  On May 25, 2017, Ms. Britt reached the end of physical therapy.  The physical therapist, Patrick Coar, recorded that she was pain free and had full range of motion.  Exhibit 2 at 55-57; but see Tr. 387 (Ms. Britt's disagreement with this record).

However, any improvement appears temporary as Ms. Britt returned to Dr. Dantuluri on August 25, 2017.  Tr. 292-94, 389.  Dr. Dantuluri recorded that "She states that her shoulder is still bothering her. The last steroid injection did not help."  Exhibit 9 at 2.  Dr. Dantuluri recommended surgery.  Id.; see also Tr. 146.

The surgery to repair Ms. Britt's rotator cuff took place on October 16, 2017.  Exhibit 9 at 6.  In his oral testimony, Dr. Dantuluri explained what he did in the surgery.

### 5. Surgical Rotator Cuff Repair

Understanding how Dr. Dantuluri attempted to correct the problem in Ms. Britt's shoulder requires some awareness of the normal structure of the shoulder joint and how Ms. Britt's pre-operation condition deviated from normal.  Dr. Dantuluri referenced exhibits that depicted the shoulder joint. These exhibits are appended to this ruling.

The shoulder is a complex joint with many parts.  At the top of the shoulder sits the "acromion."  Court exhibit 1001 at 5; see also Dorland's at 20; Tr. 138.

---

[14] During this time, Ms. Britt also sought treatment for hip and back pain.  See exhibit 7 at 4 (Dr. Jove's March 24, 2017 record); exhibit 18 at 11 (Dr. Christopher Edwards's July 21, 2017 record); Tr. 243.

Acromions come in three different types.  Tr. 154.  Below the acromion is the subacromial bursa.  Court exhibit 1001 at 5; see also Dorland's at 259.

A "bursa" is a "sac or sac-like cavity filled with a viscid fluid and situated at places in tissues at which friction might otherwise develop." Dorland's at 258; accord Tr. 215.  The subacromial bursa is designed to promote movement within the shoulder joint.  Tr. 215  The bursa is located a few centimeters from the site where vaccinations are typically injected into the shoulder.  Tr. 137.

When a bursa becomes inflamed (for whatever reason), the condition is called "bursitis."  Tr. 137-138; accord Dorland's at 260 (noting that the most common site for bursitis is the subdeltoid bursa).  Inflammation in the bursa can compress the space available for the head of the humerus, which is the bone in the upper arm.  Tr. 138; see also Court exhibit 1001 at 1.  With less space, the movement is "impinged."  Tr. 138; see also Court exhibit 1001 at 3; Dorland's at 1804.  Impingement, in turn, can lead to a tear in the rotator cuff.  Tr. 138.

Before Dr. Dantuluri's October 16, 2017 operation on Ms. Britt, he had diagnosed her as suffering from "left shoulder rotator cuff tear" and "left shoulder impingement bursitis."  Exhibit 9 at 7.  Dr. Dantuluri took various steps during the surgery.  He identified "an extensive amount of bursitis." Id. at 7-8.  He then removed the entire bursa, a procedure known as a "bursectomy." Id.; Tr. 159.  A surgeon may remove the entire bursa because the bursa grows back.  Tr. 207, 216.

Dr. Dantuluri also shaved away part of the underside of Ms. Britt's acromion.  Tr. 147, 158.  This procedure is known as an "acromioplasty." Dorland's at 20.  The purpose of the acromioplasty is to create more space with the goal of preventing impingement.  However, the consent form for the surgery warns that a bone spur can regenerate after an acromioplasty.  Tr. 156.  The combination of the bursectomy and acromioplasty is called a "subacromial decompression."  Tr. 158.

In addition to the subacromial decompression, Dr. Dantuluri also repaired the tear in Ms. Britt's rotator cuff.  Exhibit 9 at 7-8; Tr. 147.[15]  Thus, Dr. Dantuluri's post-operative diagnoses matched his pre-operative diagnoses.  Tr. 148.

Following the surgery, Ms. Britt's arm was in a sling.  Tr. 149, 194-95. Accordingly, she was not able to work.  See exhibit 37 at 21 (application for

---

[15] Whether the tendon was repaired affects the therapy a person receives.  A repaired tendon requires a more conservative therapy to avoid undoing what the surgeon did.  Tr. 84-86.

leave), exhibit 37 at 12 (changing Ms. Britt's leave status), exhibit 37 at 9 (Dr. Dantuluri's November 2, 2017 statement about Ms. Britt's disability). About two weeks after the surgery, Ms. Britt was taking pain medications and reporting that the pain was "tolerable." Exhibit 12 at 56.

Ms. Britt saw Dr. Dantuluri in routine follow up on October 31, 2017. Exhibit 12 at 54. In this appointment, Dr. Dantuluri referred her to another round of physical therapy. See exhibit 12 at 51 (physical therapy note); Tr. 296 (Ms. Britt's testimony about the physical therapy). With the improvements in physical therapy, Dr. Dantuluri released Ms. Britt to return to her employment on February 1, 2018. Exhibit 37 at 19. In Dr. Dantuluri's view, an absence of work for approximately 3.5 months is typical after a rotator cuff surgery. Tr. 149-50.

By March 16, 2018, Ms. Britt had essentially recovered. She told Dr. Dantuluri's physician's assistant (Ms. Davis) that she "is doing wonderfully" and that she planned to continue therapy on her own. Exhibit 15 at 2; see also Tr. 174-75, 302 (Ms. Britt stating shoulder pain does not affect her in any way today), 422 (Mr. Britt's testimony that his wife is ok now). In an affidavit, Ms. Britt essentially corroborated this account, stating that she had recovered to her previous state of health, more-or-less. Exhibit 21 ¶ 11.[16] Dr. Dantuluri expected that surgery would have cured her problem. Tr. 202-03, 207.

Apparently, in spring 2019, Ms. Britt's attorney, Leah Durant, communicated with Dr. Dantuluri, requesting that he present a letter on her behalf. Tr. 167. To be more precise, Ms. Durant communicated with an assistant to Dr. Dantuluri. Id. Once an attorney arranges for a letter from Dr. Dantuluri (including payment for doctor's time in writing the letter), then Dr. Dantuluri learns about the attorney's request for information.

Dr. Dantuluri's experience in treating people whose injuries are covered by a Workers' Compensation program aided his process in drafting a report. For example, he is accustomed to writing opinions "to a reasonable degree of medical certainty." Tr. 169.

For Ms. Britt, Dr. Dantuluri briefly summarized his treatment of her. He stated that when he saw Ms. Britt for shoulder pain on October 28, 2016, Ms. Britt "stated this was a new injury for her." Exhibit 24 at 1. Dr. Dantuluri continued:

---

[16] While Ms. Britt did not see Dr. Dantuluri for any shoulder problems, she saw him for unrelated problems, such as a thumb laceration. Tr. 175-76. During the intervening appointments, Ms. Britt did not complain about shoulder problems. Tr. 203.

"At the time of her visit Ms. Britt did not mention her recent vaccination. However, I was told recently by Ms. Britt that her left shoulder pain developed around the time of her vaccination which was reportedly given to her on October 4, 2016." Id.  The basis for Dr. Dantuluri's statement that he was "recently" told that Ms. Britt's shoulder pain started around the time of Ms. Britt's October 4, 2016 vaccination is not readily apparent.  Nothing within Dr. Dantuluri's file created around the time that he wrote the letter indicates a communication from either Ms. Britt or an attorney representing her.  See Tr. 174.

In any event, Dr. Dantuluri opined about causation.  He stated:  "It certainly is within a reasonable degree of medical certainty that her left shoulder pain could be causally related to her vaccination."  Exhibit 24.  This opinion is further discussed in the following section.

### 6.  Dr. Dantuluri's Opinion regarding Causes of Shoulder Problems

Dr. Dantuluri has treated patients who may have a shoulder problem due to a vaccination.  He sees 100-150 patients per week of which 60-80 have shoulder problems.  Of this group, two or three patients per year report a shoulder problem due to a vaccine.  Tr. 127-28.  However, Dr. Dantuluri is not familiar with the entity known as "SIRVA."  Id.

Dr. Dantuluri opined that an error in administering a vaccine can lead to inflammation in the bursa.  Tr. 137.  These errors and vaccine-related injuries are rare.  Id.  Bursitis, in turn, can cause a rotator cuff tear.  Tr. 139, 203.  Dr. Dantuluri indicated that the insertion of a needle is not likely to cause a tear in the rotator cuff directly because the needle is too thin.  Tr. 204, 208.  Instead, the mechanism for injury is inflammation.  Tr. 208.

While a vaccination might induce bursitis, bursitis has other causes too.  Dr. Dantuluri identified trauma as an alternative cause for bursitis.  Another cause is the degenerative process of aging.  Tr. 214.

In his letter to Ms. Durant, Dr. Dantuluri stated that Ms. Britt's "left shoulder pain could be causally related to her vaccination."  Exhibit 24 (emphasis added).  However, during his testimony, Dr. Dantuluri appears not to have been asked as to whether he could opine, to a reasonable degree of medical probability, that the vaccine did cause Ms. Britt's shoulder problem.  Whether the omission of this testimony affects the remainder of the litigation remains to be determined.

**Conclusion**

Ultimately, the undersigned has reviewed all documents and the testimony provided by Ms. Britt and her witnesses.  The undersigned finds the following:

1. By June 1, 2016, Ms. Britt's left shoulder was functioning normally.  Her shoulder, defined as the area around and including her rotator cuff, continued to function normally through October 4, 2016.  However, Ms. Britt did experience some problem with her trapezius muscles around this time.
2. On October 4, 2016, Ms. Britt received the flu vaccination in her left shoulder.
3. On October 4, 2016, Ms. Britt began to experience pain in her left shoulder.

Accordingly, the Secretary is ORDERED to file a status report regarding proposed next steps by **Thursday, September 30, 2021.**

Any questions may be directed to my law clerk, Jason Wiener, at (202) 357--6360.

**IT IS SO ORDERED.**

_s/ Christian J. Moran_
Christian J. Moran
Special Master

21

# Court Exhibit 1001

# Various Diagrams, Depicting Shoulder



Shoulder Impingement





Source: https://myfamilyphysio.com.au/wp-content/uploads/2019/04/SA-impingement-1.jpg



Source: http://2.bp.blogspot.com/-L3cgBnSPBk8/Urzg-fr5DPI/AAAAAAAAARE/vmS-U5kxeB0/s1600/shoulder+1.jpg